1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DONALD GROVES,

          Plaintiff,

   v.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

CASE NO. 1:09-cv-00537-SMS

ORDER AFFIRMING AGENCY'S
DENIAL OF BENEFITS

     Plaintiff Donald Groves, proceeding *in forma pauperis*, by his attorneys, Law Offices of Jeffrey Milam, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record and applicable law, this Court concludes that the ALJ properly found Plaintiff ineligible for benefits.

I.    **Administrative Record**

   A.    **Procedural History**

     On June 26, 2006, Plaintiff filed protectively for a period of disability and disability insurance benefits.  AR 14.  His claims were initially denied on December 6, 2006, and upon

---

[1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 9 & 11).

1  reconsideration, on March 23, 2007.  AR 14.  On April 23, 2007, Plaintiff filed a timely request

2  for a hearing.  AR 14.   Plaintiff appeared and testified at a hearing on December 4, 2007.  AR 26-

3  49. On March 26, 2008, Administrative Law Judge William C. Thompson, Jr., denied Plaintiff's

4  application.  AR 14-22.  The Appeals Council denied review on February 6, 2009.  AR 1-4.  On

5  March 20, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

6      **B.    Factual Background**

7      Plaintiff Donald Groves, born January 21, 1958, alleges permanent disability arising from

8  chronic pain in both feet.  Plaintiff also has a history of coronary artery disease, which he does not

9  allege as the primary basis for his disability.  Records pertinent to his coronary artery disease and

10  related treatment are included in the record at AR 242-285; 349-50; 381-83; 413.

11      **Plaintiff's Pain Questionnaire.**  On July 30, 2006, Plaintiff prepared a pain report.  AR

12  30, 112-14.  Before he developed pain in his feet, Plaintiff worked as a truck driver, attended

13  family sports activities, did yard work, and went shopping.   AR 113.  Afterward, Plaintiff was

14  able walk for five minutes or one-half block, stand for five minutes, and sit all day.  AR 114.

15  Other people drove Plaintiff and did errands for him.  AR 114.

16      Plaintiff's foot pain began in 2003 and began to affect his activities on August 15, 2004.

17  AR 112-13.  The pain was constant and felt like "freezer burn," "electrical shock," " bruised," and

18  "tender." AR 112.  It spread to his back and hips. AR 112.  His daily pain medications included

19  the fentanyl patch (200 mg.),[2] Neurontin® (3000 mg.),[3] nortriptyline (20 mg.),[4] and vicodin

20  ///

21  ///

22  ///

23  ───────────

24      [2] The fentanyl patch, also known as Duragesic®, is a transdermal narcotic analgesic used to relieve chronic
    pain when other medications are ineffective.  www.medicinenet.com/fentanyl-transdermal/article.htm (July 26,
25  2010).

26      [3] Neurotin®  (gabapentin) is an anticonvulsant prescribed to control certain types of seizures and to relieve
    post-herpetic neuralgia, a burning, stabbing pain that occurs after a patient has shingles.
27  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940 (July 26, 2010).

28      [4] Nortripyline, also known as Pamelor® or Aventyl®, is a tricyclic antidepressant.
    www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000732 (July 26, 2010).

1   (#10).[5]  AR 112-13.  The medication had "very little" effect on relieving the pain and lasted three

2   to four hours.  AR 112.

3       **Medical Records.**  Plaintiff's medical records set forth the course of his treatment from

4   early 2005.  On March 24, 2005, Dr. Harish P. Porecha conducted electrophysiological testing on

5   Plaintiff's feet.  AR 239.  Non-fasting blood tests performed at Dr. Porecha's request revealed that

6   Plaintiff's mean blood glucose (130 mg/dL) was above the non-diabetic range (70-115 mg/dL).

7   AR 237.  Plaintiff's blood also had a level of creatine kinase (395 U/L) above the reference range

8   (0-200 U/L).  Ar 227, 237.  Porecha diagnosed diabetic neuropathy in the peroneal nerves of both

9   feet and possibly in the right superficial peroneal nerve sensory fibers.  AR 226; 229-30; 233; 239.

10  He prescribed vicodin for pain and suggested that Carlson refer Plaintiff to an endocrinologist.

11  AR 234.

12      Results of lab tests performed at Kaiser Permanente, dated July 1, 2005, showed high

13  cholesterol (247 mg/dL: normal range ends at 239 mg/dL) and very high triglycerides (1299

14  mg/dL: normal range runs to 199 mg/dL).  AR 174.  The triglyceride levels were so extreme that

15  the lab repeated the test to confirm the initial results.  AR 174.  The report directed the physician

16  to confirm that the patient was fasting.  AR 174.

17      On August 2, 2005, Plaintiff had a pre-operative appointment with orthopedist Paul

18  Braaton, who was to surgically lengthen Plaintiff's right heel tendon.  AR 221, 223. Plaintiff

19  reported sporadic smoking and alcohol use, and denied illicit drug use.  AR 221.  Plaintiff

20  reported a history of cardiac disease, including per cutaneous transluminal coronary angioplasty

21  with placement of stents.  AR 221.  His medications included Mevacor®,[6] Isordil®,[7] Plavix®,[8]

22

23      [5]  Vicodin® (hydrocodone bitatarate and acetaminophen) is a narcotic pain reliever used to relieve
24  moderate to severe pain.  www.drugs.com/vicodin.html (July 26, 2010).

25      [6]  Mevacor® (lovastatin) is a HMG-CoA reductase inhibitor (statin) prescribed to slow the body's
    production of cholestrol.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000877 (July 26, 2010).

26      [7]  Isordil® (isosorbide) is used to relieve chest pain (angina).
27  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000660 (July 26, 2010).

28      [8]  Plavix® (cloridogrel) is an antiplatelet drug prescribed to prevent strokes and heart attacks by preventing
    the formation of harmful blood clots.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000040 (July 26, 2010).

1    Coreg®,[9] Lasix® with potassium,[10] Digitek®,[11] Duragesic patches, and Protonix®.[12]    AR 221.

2    Braaton's consultation report, dated August 15, 2005 (AR 192-201), noted that Plaintiff

3    had suffered a forklift accident about two months earlier, which had aggravated his symptoms.

4    AR 199.   Although Plaintiff previously had a narcotic addiction problem, he now required

5    Vicodin® to tolerate his foot pain.  AR 199.  On September 1, 2005, Braaton evaluated Plaintiff's

6    feet in the presence of Dr. Porecha's EMG reports.  AR 191.

7    The report of Braaton's pre-surgical physical examination on October 12, 2005, is mostly

8    illegible.  AR 218-20.  Plaintiff's chief complaint was right heel cord contractures.  AR 218.

9    Braaton performed per cutaneous tendo Achilles lengthening on Plaintiff's right leg on October

10    18, 2005.  AR 217.

11    On October 31, 2005, seven weeks after the operation to lengthen his right achilles tendon,

12    Plaintiff was using fentanyl patches and experiencing no pain and a decrease in tingling and

13    numbness.  AR 189.  On January 9, 2006, Plaintiff still experienced numbness and could not do a

14    "toe-off" because of the arthritis and rigidity of his first metatarsophalangeal joint.  AR 186-87.

15    On February 10, and March 21, 2006, Braaton examined Plaintiff before a right

16    metatarsal-phalangeal hemiarthroplasty and tarsal tunnel release of Plaintiff's right foot.  AR 205-

17    07; 208-10.  Plaintiff reported that he smoked a pack a day and used alcohol occasionally but

18    denied illicit drug use.  AR 205, 209.  His current medications were Mevacor, Isordil, Plavix,

19

20

21

22    [9] Coreg® (carvedilol) is a beta-blocker prescribed to treat heart failure and high blood pressure.
23    www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001012 (July 26, 2010).

24    [10] Lasix® with potassium (furosemide with potassium) is a diuretic prescribed for the treatment of high
     blood pressure and other conditions that require the elimination of excess water from the body.
25    www.healthsquare.com/newrx/las1220.htm (July 26, 2010).

26    [11] Digitek® (digoxin oral) is prescribed to treat heart failure and abnormal heart rhythms.
     www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000643 (July 26, 2010).

27    [12] Protonix® (pantoprazole) is a proton pump inhibitor used to treat gastroesophageal reflux disease
28    (GERD) and other conditions in which the stomach produces excess acid.
     www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000177 (July 26, 2010).

Coreg, Prinivil®,[13] Lasix with potassium, Digitek, Duragesic (fentanyl) patches, hydrocodone,[14] and Protonix. AR 205, 208. Braaton diagnosed:

1.  Hallux deformity of the right lower extremity.
2.  First metatarsophalangeal arthritis of the right lower extremity.
3.  Probable tarsal tunnel syndrome of right lower extremity.
4.  Pes cavus deformity of the right foot.
5.  Mild claw and hammering of the left toes on the right foot.

AR 206, 210.

On February 23, 2006, Plaintiff met with Dr. James Carlson, his supervising physician, to resolve problems with MS contin®,[15] which was making him sick, and to secure medication for his psoriasis. AR 184. Carlson prescribed Vicodin® and Duragesic® patches. AR 184. Plaintiff returned on March 3, 2006, complaining of an inability to get the 25 mcg. fentanyl patches to stick to his skin. AR 183. Carlson prescribed 50 mcg. patches and reduced Plaintiff's Vicodin® dosage. AR 183. Plaintiff also sought medication for involuntary leg movement and was referred to Dr. Braaton. AR 183.

On March 20, 2006, Carlson noted that medications prescribed so far had been ineffective in controlling Plaintiff's foot pain. AR 436. Accordingly, he prescribed fentanyl patches (50 mcg/hour) and Vicodin® as needed for breakthrough pain. AR 436.

On March 21, 2006, Braaton performed (1) a bunionectomy with arthroplasty, and (2) tarsal tunnel release, right foot. AR 202-04. Plaintiff received post-surgical follow-up on April 3, 2006. AR 182. Braaton noted that Plaintiff was requesting refills of pain medications both from his office and from Carlson. AR 182. In a dictated memorandum of a phone conversation dated April 4, 2006, Braaton's physician assistant, Stacy Garrison, noted:

---

[13] Prinovil® (lisinopril) is an angiotension-converting enzyme (ACE) inhibitor prescribed to treat high blood pressure and, in combination with other medications, to treat heart failure. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917 (July 26, 2010).

[14] Hydrocodone is an opiate (narcotic) pain reliever and antitussive, prescribed to relieve pain. It is available only in combination with other ingredients. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014 (July 26, 2010).

[15] MS contin® (morphine oral) is an opiate (narcotic) analgesic used to relieve moderate to severe pain expected to continue around-the-clock for several days. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000590 (July 26, 2010).

Apparently, Mr. Groves has been receiving pain prescriptions from both our office and his primary care office. Specifically, he has been receiving Percocet and Norco 10 from our office, and Percocet, Norco 10, Fentanyl Patches, and Darvocet N-100 from his primary care physician. The patient continues to complain of pain, and following a long conversation with the physician assistant at Dr. Carlson's office, we have decided at this point to refer him to a pain management clinic. Hopefully, this will provide him with better pain management. This will also obviously clear up some of the confusion as to who is in charge of managing Mr. Groves' pain. In the meantime, he was given a prescription for Percocet 5/325 1-2 tablets p.o. 4-6 hours p.r.n. pain #30, no refills at this last visit on 04/03/06 by myself, Stacy Garrison, PA-C. In the event that this prescription runs out before he can have his pain management consultation, I will provide him with another refill of Percocet. Otherwise, in the future following his contract with pain management, we will not be providing him with any more pain medications.

AR 181.[16]

On April 4, 2006, Dr. Hansen's assistant also noted the issue with Plaintiff's pain management:

> S.   The patient has had a joint replacement surgery by Dr. Berryton's [*sic*] office. At this point, he has been getting pain management from both Dr. Berryton and us, which I have told him is not allowed. He has gotten a bottle of Percocet and a bottle of Norco from them right after the surgery, which is on the 20th of March. He then got a bottle of Percocet from Dr. Carlson of # 30. He then stated that he was not getting pain control from that so he came back in and spoke to Dr. Hansen and myself, and we gave him # 20 OxyContin. After that point, he went to Dr. Berryton's office, who told them that they were going to be doing his pain management instead of us and got another bottle of Percocet from them. I have told him that he really needs to stop going back and forth and that his pain management needs to come from one place. We spoke to Dr. Berryton's office and they are willing to do it; therefore, we will defer his pain management to them.
>
> P:   At this point, however, he states that he wants to get a pain doctor because he is in pain all the time and is taking a lot of pain medication to get it under control. Therefore, we will process a referral to Kaiser Pain Management, but in the interim, he is not to get pain management from us. He needs to speak to Dr. Berryton over his office.

AR 434.[17]

///

---

[16] Percocet® (acetaminophen and hydrocodone) is a narcotic pain reliever prescribed for moderate to severe pain. www.drugs.com/percocet.html (July 26, 2010).
     Norco® (acetaminophen and hydrocodone) is a narcotic pain reliever prescribed for moderate to severe pain. www.drugs.com/norco.html (July 26, 2010).
     Darvocet® (acetaminophen and propoxyphene) is a narcotic pain reliever prescribed for mild to moderate pain with or without fever. www.drugs.com/darvocet.html (July 26, 2010).

[17] Oxycontin® (oxycodone) is an opiate (narcotic) analgesic used to relieve moderate to severe pain. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589 (July 26, 2010).

1    At the surgical follow-up appointment on April 10, 2006, Plaintiff continued to complain

2    of chronic pain but was "unable to ascertain the origin in the foot since he has pain in his bilateral

3    lower extremities."  AR 180.

4    On April 15, 2006, after two surgeries on his feet, Plaintiff complained to Carlson of

5    chronic foot pain and depression.  AR 173.  Plaintiff could not walk barefoot.  AR 166.  Plaintiff

6    described two types of pain: (1) combinations of freezing and burning, and shocking pain, and (2)

7    a deep pain akin to a bone bruise.  AR 165.  Carlson requested a specialist consultation with Dr.

8    LeFevre, a chronic pain management specialist.  AR 167.  Plaintiff was taking Duragesic® and

9    Norco®, which helped him cope with the pain but did not stop it; Neurontin®, which caused him

10   excessive sleepiness; Naprosyn®;[18] lisinopril; and Coreg®.  AR 166.

11   Plaintiff advised Carlson that he had been a long-term abuser of marijuana[19] and

12   methamphetamine,[20] whose drug of choice was methamphetamine when the pain began.  AR 166.

13   Plaintiff believed that methamphetamine initially masked the foot pain.  AR 166.

14   Plaintiff also saw an internist, Dr. Greene on April 15, 2006.  AR 171-72.  Greene

15   diagnosed foot pain and depression, and prescribed Norco®, Naprosyn®, and Effexor®.[21]  AR

16   172.

17   ///

18   ///

19

20

21   [18]  Naprosin® (naproxen) is a nonsteroidal anti-inflammatory drug prescribed to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis, and ankylosing spondylitis, among other conditions.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526 (July 26, 2010).

22

23   [19]  Marijuana is composed of dried parts of the Cannabis sativa hemp plant.  Short-term effects include euphoria, distorted perception, memory impairment, and difficulty thinking and solving problems. www.drugabuse.gov/DrugPages/Marijuana.html (July 26, 2010).  Marijuana is a schedule I substance under the Controlled Substances Act (21 U.S.C. § 801 et seq.).  Certain marijuana use is decriminalized in California. www.justice.gov/dea/concern/marijuana.html (July 26, 2010).

24

25   [20]  Methamphetamine is an addictive stimulant related to amphetamines.  It increases wakefulness and physical activity, increases heart rate, causes irregular heartbeat, increases blood pressure and body temperature. www.nida.nih.gov/drugpages/methamphetamine.html (July 26, 2010).

26

27   [21]  Effexor® (venlafaxine) is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) prescribed to treat generalized anxiety disorder, social anxiety disorder, and panic disorder.  It also controls depression. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947 (July 26, 2010).

28

On April 30, 2006, Plaintiff saw Dr. Robert Abatecola, who questioned whether Plaintiff was pre-diabetic.  AR 170.  Abatecola ordered lab tests and prescribed Neurontin® and MS (10 mg.)[22] with Phenergan® (25 mg).[23]  AR 170.

On May 4, 2006, Carlson recorded concerns regarding Plaintiff's use of pain medication:

S:  This patient need his pain medications refilled.  He is on Fentanyl patches 50 mcg/hour.  He also takes Vicodin 10 mg. up to eight per day.  I suggested that he get to the pain control physician as soon as possible. He is not getting pain medication from Dr. Braaton anymore, but he is still getting the Fentanyl patches.

P:  We will make a contract with him today and I told him if he does not stick to the contract, we will terminate him from our practice, in other words he understands the agreement.  In the meantime, we will try to control his pain with over using.  He is using Neurontin, but he is only on half of 300 mg tablet twice a day at present time, working up slowly.

AR 430.

On May 10, 2006, Braaton reported that Plaintiff had improved sensation on the plantar surface of his foot and his range of motion was 20-30 degrees dorsiflexion and 10 degrees plantar flexion.  AR 178.

On June 14, 2006, Plaintiff complained of significant pain and numbness from the ball of his foot distally.  AR 177.  The pain was so bad that Plaintiff had been unable to stop using the fentanyl patch, even though he needed to discontinue its use to return to truck driving.  AR 177.  Plaintiff was also taking Neurontin®, which he reported was also ineffective.  AR 177.  "These are all essentially new complaints, which were evaluated today," observed Braaton.  AR 177.

Although the tarsal tunnel release had improved the sensation in Plaintiff's foot and relieved the pain he had felt in the sole of his foot, Plaintiff had developed arthrofibrosis in the first metatarsophalangeal joint and was experiencing gastrocnemius contracture in his right leg.  AR 176.  Alternatives included prescription Lyrica®[24] or Lyrica® combined with a custom

---

[22] MS likely is morphine sulfate.  *See* n. 19.

[23] Phenergan® (promethazine) is used to relieve the symptoms of allergic reactions, to relax and sedate patients prior to surgery, to relieve post-surgical pain, and to control post-surgical nausea and vomiting. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000637 (July 26, 2010).

[24] Lyrica® (pregabalin) is an anticonvulsant used to relieve epileptic seizures and neuropathic pain (pain from damaged nerves) in the arms, hands, fingers, legs, feet, and toes resulting from diabetes, shingles, or fibromyalgia.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327 (July 26, 2010).

1  orthotic and metatarsal pad.  AR 176.  Because of the limitations in his insurance coverage,

2  Plaintiff himself would be responsible for the expense associated with physical therapy.  AR 176.

3  Braaton directed Plaintiff to remain off work until August 1, 2006.  AR 175.

4  In his notes on Plaintiff's July 27, 2006 appointment, Carlson noted that Plaintiff had

5  neuropathy of the feet:

> This patient is having a lot of trouble with pain in his feet.  He is continually on
> Neurontin, Vicodin and Fentanyl patch, but he continues to have pain and wants to
> know if there is anything more that can be done.  He has had three or four
> operations by Dr. Braaton, thinking that it may be entrapment syndrome, but he
> really has polyneuropathy of both feet.  He doesn't have diabetes, but he does have
> a history in the family of father having had rather severe diabetes mellitus.

AR 426.

Plaintiff saw Neurologist Kevin O'Dell on July 28, 2006.  AR 396-97.  The nontranscribed

report is largely illegible but appears to consist mainly of Plaintiff's medical history.  AR 391.

O'Dell noted that Plaintiff's neuropathy had now reached his lower calves.  AR 396.  O'Dell

prescribed Pamelor®[25] and suggested topical application of Borrage oil.[26]  AR 397.

Plaintiff saw O'Dell again on September 26, 2006.  AR 391.  Again, the report is not

transcribed and mostly illegible.  AR 391.  It appears, however, that Plaintiff reported no

improvement on Pamelor® and that O'Dell recommended a trial of Borrage oil.  AR 391.

On October 19, 2006, Plaintiff reported that halving his Duragesic® prescription had not

worked as well as a full dose.  AR 162.  Because Dilaudid®[27] caused horrible depression, Plaintiff

had flushed it away.  AR 162.  Either Pamelor® or Neurontin® had worked well, but Plaintiff had

stopped taking these a week earlier with no increase in pain.  AR 162.  Pain patches worked best

[25]  Pamelor® (nortriptyline) is a tri-cyclic antidepressant.  www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000732 (July 23, 2010).  *See* n. 4.

[26]  The Court assumes that O'Dell misspelled the name of an herbal medicine called Borage oil, derived from the herb borage.  *See* Memorial Sloan-Kettering Medical Center, "About Herbs: Borage," www.mskcc.org.mskcc/html/69148.cfm .  Borage oil contains gamma-linoleic acid (GLA), which has some benefits in treating rheumatoid arthritis and may have anti-inflammatory properties.  Studies of its topical use on skin conditions such as eczema and seborrhea, yielded mixed results.  Borage oil contains the alkaloid amabiline, a liver toxin, and must only be used in limited amounts.

[27]  Dilaudid® (hydromorphone) is used to treat moderate to severe pain.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000545 (July 26, 2010).

9

at controlling the freezing-burning-shocking sensation.  AR 162.  Plaintiff told LeFevre that he had recently smoked marijuana and experienced profound relief of his foot pain.  AR 162.

Lab tests results on November 7, 2006 showed all blood components tested within the normal range except for high triglycerides.  AR 163.

By the time Plaintiff saw LeFevre on December 20, 2006, he had reduced his cigarette use to one-half pack per day.  AR 161.  Plaintiff was using three-100 mic. Duragesic® patches every two days, but reported difficulties with their failing to stick to his skin.  AR 161.  He was also taking three to four Percocet® (10 mg.) two to three times daily.  AR 161.  LeFevre noted:

> [P]ain is in both feet, like on two ice cubes, numb feeling.  Flares under arch and is hard to walk, one foot to the other.  Legs ache and then not walk right and [a]ffects both back and hips.  Like freezer burn and like wet cold feeling.

AR 161.

Plaintiff's lowest pain level was rarely 3-4/10, and more frequently, 5-6/10.  AR 161. LeFevre diagnosed peripheral neuropathic pain.  AR 161.  LeFevre switched Plaintiff to Oxyfast®[28] to see if he could tolerate it in place of the Duragesic®, lidocaine ointment,[29] and Hytrin® capsules.[30]  AR 161.

At his March 15, 2007, appointment, Plaintiff reported that Duragesic® and Oxyfast® were effective in treating the freezing and burning sensation as well as the deep pain.  AR 394. His pain level was "nothing its like its not there."  AR 394.  Plaintiff said that he was a "different man, can walk and go and is fantastic."  AR 394.  Plaintiff continued to smoke one-half pack of cigarettes per day.  AR 394.  LeFevre added a handwritten note to Carlson: "Jim–Don is doing very well–once more stable, I will refer him back to you to continue the program."  AR 395.

///

---

[28]  Oxyfast® is concentrated oxycodone, a narcotic pain reliever prescribed for moderate to severe pain. www.drugs.com/cdi/oxyfast-concentrate.html (July 26, 2010).

[29]  Lidocaine cream is a topical anesthetic used to reduce pain, itching, soreness, and discomfort of the skin. www.drugs.com/cdi/lidocaine-cream.html (July 26, 2010).

[30]  Hytrin® (terazosin hydrochloride) is prescribed to increase urine flow in patients with symptomatic benign prostatic hypoplasia.  It may also be used to treat hypertension (high blood pressure). www.dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=5253 (July 26, 2010).

1    At Plaintiff's March 16 appointment, Carlson noted "fairly high cholesterol of 227,
2    triglycerides are 594, and his LDL could not be calculated." AR 418.  Carlson discussed the
3    importance of Plaintiff's taking his medications (Lopid®[31] and lovastatin) to remain healthy.  AR
4    418.
5    Following Plaintiff's May 31, 2007 appointment, LeFevre noted that Plaintiff was "doing
6    well, as long as [he] takes meds." AR 393.  Duragesic® (100 mlc 1 q 2 days) worked well for
7    freezing and burning pain, and Oxyfast® (20 mg./ml 3 ml q 3-4 hours) was better for all pains.
8    AR 393.  Plaintiff, who previously could do nothing, reported that he was more active, shopping,
9    walking, and walking his dog around the Johansen ball fields, and that his pain was 1-2/10.  AR
10   393.  Plaintiff was still smoking one-half pack of cigarettes daily.  AR 393.
11   ///
12   ///
13   On July 27, 2007, lab tests showed that Plaintiff's triglycerides were 765.  AR 414.
14   Plaintiff state[d] that it has been doubled than in the past, however he really was not taking his
15   Lopid® at the time this test was done." AR 414.
16   **Agency neurologic evaluation.**  Dr. Steve McIntire examined Plaintiff and completed a
17   neurologic evaluation for the agency.  AR 351-354.  McIntire was not able to review the
18   EMG/nerve conduction work-up, among other records.  AR 351.  Plaintiff advised McIntire that
19   diabetic neuropathy had been ruled out and that his neuropathy was due to elevated triglycerides.
20   AR 351.  Plaintiff's current medications were gabapentin, Coreg®, gemfibrozil, hydromorphone,
21   Lovastatin®, nortriptyline, lisinopril, and fentanyl patches.  AR 351.
22   McIntire observed that Plaintiff was "in no acute distress." AR 352.  Plaintiff walked with
23   a limp but without "gross instability of gait," and used no assistive device, such as a cane.  AR
24   352.  Plaintiff demonstrated "diminished appreciation of small fiber modalities and soft touch
25   distally in the lower extremities," extending to mid-calf.  AR 353.  Plaintiff's sense of vibration
26

---

27   [31]  Lopid® (gemfibrozil) is prescribed to reduce the amount of cholestrol and triglycerides in patients with
28   very high triglyceride levels who are at risk of pancreatic disease.
     www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000854 (July 26, 2010).

1    was diminished in both feet, and he demonstrated no reflexes in his lower extremities.  AR 353.

2    McIntire diagnosed peripheral neuropathy of unclear etiology.  AR 353.

3         McIntire opined:

4         Given the above findings, the claimant would have significant functional
          limitations.  He would be limited to 2-3 hours of walking or standing in an eight-
5         hour day.  He should not work in capacities that require fine balancing on his feet
          such as working on ladders or scaffolding.  He should not lift or carry more than 25
6         pounds when upright.  The current examination does not suggest limitations in
          terms of time sitting.  He would have some difficulty operating foot controls with
7         his feet.  There are not otherwise manipulative limitations.  The current
          examination does not suggest communicative or cognitive limitations.
8
          AR 353-54.
9
              **Agency's Residual Functional Capacity Assessments.**  Neurology consultant D.D.
10
     Sharbaugh completed an Agency's Residual Functional Capacity Assessment on November 2,
11
     2006.  He opined that Plaintiff could lift ten pounds frequently and 20 pounds occasionally; stand
12
     or walk a total of two hours in an eight-hour workday; sit with normal breaks about six hours in
13
     an eight-hour workday; was limited in his ability to push or pull in his lower extremities; and
14
     could climb ramps, stairs, ladders, ropes or scaffolds only occasionally.  AR 358, 360.  Sharbaugh
15
     noted:
16
          The claimant does not meet 9.08 with no gross gait instability and does not meet
17        4.02 since the record reflects noncompliance regarding taking cardiac meds.  The
          claimant's alleges [*sic*] pain in the feet which is supported by clinical findings of
18        neuropathy and treatment.  With pain management the claimant has no gross gait
          instability and great weight is given the ce mss due to pain of 25 lbs. lift, stand or
19        walk 3 hours, no sitting restrictions and avoidance of foot controls, ladders and
          balancing.
20
          AR 358.
21
              Psychiatrist A.H. Middleton found no evidence in the record to document allegations that
22
     Plaintiff had limitations in memory and concentration.  AR 373.  According to his medical
23
     history, Plaintiff had been off methamphetamine for over 2 years.  AR 373.
24
              **Dr. O'Dell.**  O'Dell submitted a questionnaire dated January 9, 2007 on behalf of Plaintiff.
25
     AR 378.  O'Dell opined that, because of Plaintiff's length-dependent neuropathy (weakness of
26
     foot muscles and imbalance), he was unable to perform full-time work at any exertional level,
27
     including the sedentary level.  AR 378.  According to O'Dell, Plaintiff could sit without
28

1    limitation, stand or walk a total of thirty minutes at one time and within an eight-hour day, and

2    needed to elevate his legs for four hours of an eight-hour work day.  AR 378.  O'Dell opined that

3    Plaintiff's disability began at some point from January 2005 to January 2006.  AR 378.

4    **Plaintiff's testimony.**  Plaintiff had not worked since August 2, 2005.  AR 31.  Although

5    he had hoped to return to his job as a truck driver, he was unable even to wear his work boots.

6    AR 31-32.  The nerve pain in his feet and hands was too painful to allow him to stand up.  AR 33.

7    Plaintiff described his pain as a freezing and burning sensation in his feet.  AR 37.  His

8    feet were numb, although sensitive to pressure.  AR 38.  Because his feet were also tender,

9    Plaintiff could not walk anywhere without wearing shoes.  AR 38.

10   Plaintiff was able to walk 50 to 100 yards at a time and to stand for a couple of minutes.

11   AR 38.  He could sit for ten or fifteen minutes.  AR 38.  He could use his hands to grasp only for a

12   minute or two, then would need to rest his hands for two to three hours.  AR 42-43.  Because he

13   had calcium deposits in his shoulders,[32] Plaintiff could lift ten pounds, at most.  AR 39.

14   Plaintiff's medication caused him to need frequent naps.  AR 39.  It also impaired his

15   short-term memory and concentration.  AR 43.  For example, Plaintiff could no longer read books

16   or watch movies–they lasted too long.  AR 43.

17   On a typical day, Plaintiff wakes at about 9:00 a.m. and watches television for a few hours

18   before eating breakfast.  AR 36.  He then might go out to the post office or the bank before

19   returning home to nap for a couple of hours.  AR 36.  After his nap, Plaintiff would watch more

20   television before napping until dinner.  AR 36-37.  Plaintiff would then get up, eat dinner, and

21   watch television until returning to bed.  AR 37.

22   Plaintiff was depressed because he could no longer provide for his family.[33]  AR 42.  He

23   was no longer able to play with his children.[34]  AR 42.  Plaintiff had not been referred to a

24   ///

25

26   [32]  Plaintiff's medical records include no reference to calcium deposits in his shoulders or elsewhere.

27   [33]  As a result of Plaintiff's chronic drug abuse, Plaintiff and his wife divorced in 1990.  AR 91.  He
     returned to live with his wife at some point before May 2006.  AR 166.

28   [34]  Plaintiff's two children were adults at the time of the hearing.  AR 209.

13

1  psychiatrist or psychologist for his depression, although he was "going to get, start seeing one, I
2  need to ask about him."  AR 45.

3      Plaintiff smoked about one-half of a cigarette pack daily.  AR 45.  He had previously had
4  problems with methamphetamine and marijuana, but had stopped using methamphetamine four
5  years earlier.  AR 45.

6      **Testimony of vocational expert.**  Vocational expert David Detmer testified that *DOT*
7  classified Plaintiff's previous truck driving position as medium, SVP 4.  AR 46.  Plaintiff had also
8  previously worked as a forklift operator, classified medium, SVP 3.  AR 46.  Neither job could be
9  performed by a hypothetical forty-nine-year-old individual, with a high school education, capable
10  of lifting twenty pounds occasionally, and ten pounds frequently, capable of standing and walking
11  in combination for a total of two to three hours per day; capable of sitting without limit; and
12  unable to operate foot controls.  AR 46. A person with such limitations could work as a cashier
13  (light, SVP 2) so long as he was not required to stand for a full workday.  AR 46.  Approximately
14  22,000 jobs were available nationally for seated cashiers.  AR 46.  Other available positions
15  included mail clerk (light, SVP 2), 10,000 positions; order clerk (sedentary, SVP 2), 14,000
16  positions; and surveillance systems monitor (sedentary, SVP 2), 2,000 positions.  AR 47.   If the
17  hypothetical individual had the limitations to which Plaintiff testified, however, he would be
18  unable to perform any of the listed jobs.  AR 47.

19  **II.**    **Discussion**

20          **A.**      **Legal Standards**

21      To qualify for benefits, a claimant must establish that he or she is unable to engage in
22  substantial gainful activity because of a medically determinable physical or mental impairment
23  which has lasted or can be expected to last for a continuous period of not less than twelve months.
24  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of
25  such severity that he or she is not only unable to do his or her previous work, but cannot,
26  considering age, education, and work experience, engage in any other substantial gainful work
27  existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).
28  ///

1   To encourage uniformity in decision making, the Commissioner has promulgated

2   regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

3   C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

4   questions:

5         Step one:      Is the claimant engaging in substantial gainful activity?  If so, the
6                                 claimant is found not disabled.  If not, proceed to step two.

      Step two:      Does the claimant have a "severe" impairment?  If so, proceed to
7                                 step three.  If not, then a finding of not disabled is appropriate.

8         Step three:    Does the claimant's impairment or combination of impairments
                              meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
9                                 App. 1?  If so, the claimant is automatically determined disabled.  If
10                                not, proceed to step four.

      Step four:     Is the claimant capable of performing his past work?  If so, the
11                                claimant is not disabled.  If not, proceed to step five.

12        Step five:     Does the claimant have the residual functional capacity to perform
                              any other work?  Is do, the claimant is not disabled.  If not, the
13                                claimant is disabled.

14  *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

15  The ALJ found that Plaintiff had not engaged in substantial gainful activity since August

16  2, 2005.  AR 16.  Plaintiff had a severe impairment: peripheral neuropathy in his lower

17  extremities.  AR 16.  His impairment did not meet or medically equal one of the listed

18  impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525,

19  and 404.1526).  AR 16.  Plaintiff could not perform his past work as a truck driver.  AR 16.  He

20  had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b):

21  capable of lifting twenty pounds occasionally ands ten pounds frequently; capable of standing and

22  walking in combination for two to three hours in a work day; and capable of sitting without limit

23  when not required to stand or walk. AR 16.  In addition, Plaintiff could not perform work that

24  required him to operate foot pedals.  AR 16.  After considering Plaintiff's age, education, work

25  experience, and residual functional capacity, the ALJ concluded that jobs that Plaintiff could

26  perform existed in the national economy in significant numbers.  AR 20.

27  ///

28  ///

**B.      Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,* *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.  Having done so, this Court concluded that substantial evidence supported the ALJ's findings.

**C.      Plaintiff's Claims**

Plaintiff contends that the ALJ erred by (1) improperly rejecting the treating doctor's opinion; (2) failing to perform a function-by-function residual functional capacity assessment; (3) failing to properly evaluate the testimony and documents in the record; and (4) failing to recontact the consulting examiner.  Had the ALJ not made these errors, he would have recognized that, because of Plaintiff's need to rest with his feet elevated, Plaintiff is unable to work for a full eight-hour day.

**1.      Failure to Adopt Treating Physicians' Opinions**

Plaintiff alleges that the ALJ erred in giving little weight to the opinion of treating physician Kevin O'Dell.  Interestingly, although Plaintiff's foot pain was treated by many

physicians, including his primary physician Dr. Carlson, over a several-year span, Plaintiff submitted only the opinion of O'Dell, a consulting neurologist who apparently examined Plaintiff only twice, on July 28 and September 26, 2006.  AR 391, 396-97.  The record includes no evidence that O'Dell ordered any testing or laboratory work, although, as a Kaiser Permanente physician, he presumably had access to the results of Plaintiff's previous testing.  Although his contemporaneous examination reports are mostly illegible, O'Dell appears to have done little more than restate Plaintiff's medical history, prescribe an antidepressant (Pamelor®) that Plaintiff had previously received and found ineffective, and suggest topical application of an herbal remedy called Borrage oil. AR 391, 396-97.   The record does not include any report of O'Dell's consultation for Dr. Carlson.

Notwithstanding his limited contact with Plaintiff, O'Dell opined that Plaintiff's length-dependent neuropathy (weakness of foot muscles and imbalance) rendered him unable to perform full-time work at any exertional level, including the sedentary level.  AR 378.  According to O'Dell, Plaintiff could sit without limitation, stand or walk a total of thirty minutes at one time and within an eight-hour day, and needed to elevate his legs for four hours of an eight-hour work day.  AR 378.

The ALJ rejected O'Dell's opinion on Plaintiff's residual functional capacity:

> I give little weight to these findings as their severity is not supported by the medical records, which do not show treatment or examination by Dr. O'Dell and they are not consistent with other substantial evidence in the record, particularly, the opinion of Dr. McIntire, a board-certified neurologist who examined the claimant.  I do not consider further development of this evidence necessary since the claimant's representative stated at the hearing that all relevant medical records had been submitted.  These drastic differences may be the possible result of sympathy for the patient or an effort to avoid unnecessary tension with the patient after a demand for supporting material by the patient.

AR 20.

The Court's task is not to re-weigh the evidence but to determine whether the ALJ's determination is supported by substantial evidence and free of legal error.  The Court must review the ALJ's express reason(s) for declining to adopt a doctor's opinion and determine whether the rejection was specific and legitimate.  An ALJ may not substitute his or her own judgment for that of a treating physician so long as the treating physician's opinion of an impairment's nature or

17

1 severity is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

2 and is not inconsistent with other substantial evidence."  SSR 96-2p at *1,  61 Fed.Reg. 34,490,

3 34,491, 1996 WL 374188 (July 2, 1996).  "If a treating physician's opinion is 'well-supported by

4 medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

5 other substantial evidence in [the] case record, [it will be given] controlling weight.'"  *Orn*, 495

6 F.3d at 631, *quoting* 20 C.F.R. § 404.1527.

7        If the treating or examining doctor's medical opinion is contradicted by another doctor, the

8 Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion,

9 supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830-31; *accord Valentine v.*

10 *Commissioner of Social Security Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Orn v. Astrue*, 495

11 F.3d 625, 632 (9th Cir. 2007).  "The ALJ can meet this burden by setting out a detailed and

12 thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation

13 thereof, and making findings.'"  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008),

14 *quoting Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

15        That the ALJ did not see O'Dell's treatment reports is obvious. Nonetheless, missing three

16 nearly illegible pages in a record exceeding 400 pages is not shocking. Nor does the ALJ's

17 rejection of O'Dell's completely unsupported opinion require reversal or remand.  To the extent

18 that this Court has been able to decipher O'Dell's examination reports, it has identified nothing

19 supporting, or even suggesting, a conclusion that Plaintiff was required to lie down or elevate his

20 feet for any period of time.

21        Nonetheless, Plaintiff contends that, because O'Dell was a treating physician, the ALJ was

22 required to accept O'Dell's opinion.  Plaintiff overstates his case.  Medical opinions regarding a

23 plaintiff's residual functional capacity must be evaluated by considering multiple factors: (1) the

24 examining relationship; (2) the treatment relationship, including (a) the length of the treatment

25 relationship or frequency of examination, and the (b) nature and extent of the treatment

26 relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that

27 support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

28 *///*

**Examining or Treating Relationship with Claimant.**  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  The Social Security Administration favors the opinion of a treating physician over those of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Lester*, 81 F.3d at 830.

 Both O'Dell and McIntire examined Plaintiff.  20 C.F.R. § 404.1527(d)(1).  While only O'Dell was a treating physician, his relationship with Plaintiff was limited.  He had only two, apparently brief, appointments with Plaintiff.  AR 391. 396-97.  Pursuant to 20 C.F.R. § 404.1527(d)(2)(I), because of O'Dell's short treatment relationship with Plaintiff, the weight of his opinion is diminished:

> Generally, the longer a treating source has treated you and the more times you have been seen by the treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  O'Dell's short and infrequent relationship also diminishes the weight to which his opinion is entitled under 20 C.F.R. § 404.1527(d)(2)(ii), which considers the extent of the source's knowledge of the claimant's impairments over an extended time period.  Based on the contemporaneous records of Plaintiff's appointments with O'Dell, O'Dell knew little more than that Plaintiff felt numbness in his feet, extending to his lower calves.

**Supportability.**  O'Dell's opinion is not supportable under 20 C.F.R. § 404.1527(d)(3), which provides, in pertinent part:

> The more a medical source presents relevant evidence to support an opinion, particularly signs and laboratory findings, the more weight we will give that

opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.

O'Dell's opinion consists of short answers to seven of ten questions on a form entitled "Questionnaire," which appears to have been prepared by Plaintiff's attorney.  AR 378.  O'Dell offers no basis for his opinions regarding Plaintiff's abilities; indeed, he supported his diagnosis of "a length-dependant polyneuropathy" on nothing more than "weakness of foot muscles, imbalance."  AR 378.

In contrast, McIntire's four-page report was specific, detailed, and supported by relevant measurements.  AR 251-54.  McIntire noted that he had reviewed Plaintiff's progress notes and discharge summary but had not been provided with all relevant records, particularly, Plaintiff's EMG/nerve conduction study.  AR 351.  McIntire observed that Plaintiff was in no acute distress and used no assistive device to walk.  AR 352.  He observed and described Plaintiff's coordination, station and gait.  AR 352.  McIntire assessed and reported Plaintiff's range of motion in his spine (both cervical and lumbar regions), shoulders, elbows, wrist, and finger and thumb joints.  AR 352.  He administered a mental status exam; assessed Plaintiff's motor strength, muscle bulk and tone; conducted a sensory exam; assessed deep tendon reflexes; tested cranial nerve function; and conducted a cerebellar exam to detect dysmetria or dysrhthmia.  AR 352-53.  McIntire diagnosed peripheral neuropathy, supporting his diagnosis with two detailed paragraphs.  AR 353.  Finally, based on his examination, testing, and diagnosis, McIntire opined that Plaintiff had "significant functional limitations," and detailed what they were.  AR 353.

**Consistency.**  "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(d)(4).  McIntire's opinion is fully consistent with the records of the other physicians who treated Plaintiff, and more importantly, with Plaintiff's self-reporting to those doctors.  On March 15, 2007, several months after pain specialist LeFevre modified his medications, Plaintiff reported that his pain level was "nothing its like its not there," and that he was "a different man, can walk and go and is fantastic."  AR 394.  LeFevre advised referring physician Carlson that he would refer Plaintiff back to Carlson for maintenance once Plaintiff was stable on the new prescriptions.  AR 395.

On May 31, 2007, LeFevre reported that Plaintiff was "doing well, as long as [he] takes meds." AR 393. Plaintiff was more active, shopping, walking, and walking his dog around the Johansen ball fields. AR 393. His pain was 1-2/10. AR 393. Plaintiff's treatment records end at this point.

No physician, *including O'Dell*, ever made any reference to Plaintiff's resting with his feet elevated at any time for any amount of time. Plaintiff himself told the agency that he was able to sit all day. AR 114. The first and only mention of Plaintiff's needing to rest with his feet elevated appears in O'Dell's opinion. AR 378. Thus, O'Dell's opinion is not consistent with the reports of all other treating and examining physicians.

**Specialization.**  The agency generally gives "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). Since both O'Dell and McIntire are neurologists, neither has an advantage based on specialty.

**Other factors.**  The Court notes that both McIntire (October 14, 2006) and O'Dell (January 9, 2007) provided their reports prior to the conclusion of Plaintiff's course of treatment, as set forth in the written record.

Upon consideration of the record as a whole, this Court finds O'Dell's opinion to vary significantly from the reported opinions and treatment records of Plaintiff's other physicians as well as the reports of Plaintiff himself. Accordingly, it concludes that substantial evidence supported the ALJ's determination to assign less weight to O'Dell's opinion than to that of McIntire.

### 2.   Failure to Perform a Function-by-Function Residual Functional Capacity Assessment

Plaintiff contends that, by disregarding Plaintiff's need to lie down for four hours of rest in an eight-hour workday, the ALJ failed to perform the function-by-function analysis required by SSR 96-8p. Plaintiff's argument misstates the ALJ's decision. The ALJ did not disregard Plaintiff's alleged need to lie down; in the context of his function-by-function analysis set forth at

///

1 │ AR 16-20, the ALJ rejected O'Dell's opinion as not supported by the medical records.  The ALJ

2 │ opined:

> A Questionnaire was prepared by Dr. Kevin O'Dell and dated January 9, 2007 (Exhibit 12F).  He opined that the claimant's medical problems precluded him from performing any full time-work at any exertional level, including the sedentary level (Exhibit 12F2).  The claimant's primary impairment was a length dependent polyneuropathy.  Over an 8-hour period, the claimant was able to sit without limitation and stand and/or walk for 30 minutes.  He must lie down or elevate his legs for 4 hours during an 8-hour day.  Dr. O'Dell indiucated that he believed that the claimant has been disabled to this degree beginning January 2005 to January 2006.  I give little weight to these findings as their severity is not supported by medical records, which do not show treatment or examination by Dr. O'Dell and they are not consistent with other substantial evidence in the record, particularly, the opinion of Dr. McIntire, a board-certified neurologist who examined the claimant.  I do not consider further development of this evidence necessary since the claimant's representative stated at the hearing that all relevant medical records had been submitted.  These drastic differences may be the possible result of sympathy for the patient or an effort to avoid unnecessary tension with the patient after a demand for supporting information by the patient.

12 │ AR 20.

13 │ Accordingly, the ALJ did not fail to conduct the function-by function analysis required by SSR

14 │ 96-8p, he merely failed to reach a conclusion favorable to Plaintiff at the end of his analysis.

15 │ **3.     Failure to Properly Evaluate Plaintiff's Testimony**

16 │ An ALJ is not "required to believe every allegation of disabling pain" or other non-

17 │ exertional requirement.  *Orn*, 495 F.3d at 635, *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

18 │ 1989).  But if he or she decides to reject a claimant's pain testimony after a medical impairment

19 │ has been established, the ALJ must make specific findings assessing the credibility of the

20 │ claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d

21 │ 735, 738 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what

22 │ evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney v.*

23 │ *Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set

24 │ forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*,

25 │ 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir.

26 │ 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that

27 │ the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947,

28 │ 958 (9th Cir. 2002).

1    When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

2  for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct,

3  claimant's daily activities, claimant's work record, and testimony from physicians and third

4  parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social*

5  *Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary

6  techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

7  statements concerning the symptoms, and other testimony by the claimant that appears less than

8  candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

9  prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti*, 533 F.3d at

10  1039, *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by

11  substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at

12  959.

13    For example, in addition to finding Mrs. Thomas's medical records did not support the

14  level of pain and the limitations to which she testified, the ALJ in *Thomas* found that Thomas had

15  an "extremely poor work history," "little propensity to work in her lifetime," and a sporadic work

16  history periodically interrupted by years of unemployment.  *Id.* Thomas, who had worked as a

17  bartender, house cleaner and concession worker, remained able to perform her own housework,

18  including cooking, laundry, washing dishes, and shopping.  *Id.* Her testimony about her drug and

19  alcohol usage was internally inconsistent and lacked candor.  *Id.*  And, most compelling, Thomas

20  impeded testing during two physical capacity evaluations, demonstrating "self-limiting behavior"

21  that embodied inconsistent and minimal effort.  *Id.*

22    The Ninth Circuit has summarized the applicable standard:

23    [T]o discredit a claimant's testimony when a medical impairment has been
    established, the ALJ must provide "'specific cogent reasons for the disbelief.'"
24    *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The
    ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Id.*
25    Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a
    malingerer, those "reasons for rejecting the claimant's testimony must be clear and
26    convincing."  *Id.*  Social Security Administration rulings specify the proper bases
    for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's
27    testimony cannot be supported by reasons that do not comport with the agency's
    rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have
28    the same force and effect as the statute or regulations, they are binding on all

1  components of the Social Security Administration, . . . and are to be relied upon as
2  precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10[th]
   Cir. 1998) (concluding the ALJ's decision at step three of the disability
3  determination was contrary to agency rulings and therefore warranted remand).
   Factors that an ALJ may consider in weighing a claimant's credibility include
4  reputation for truthfulness, inconsistencies in testimony or between testimony and
   conduct, daily activities, and "unexplained, or inadequately explained, failure to
5  seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603;
   *see also Thomas*, 278 F.3d at 958-59.

6  *Orn*, 495 F.3d at 635.

7      An ALJ may not disregard a claimant's testimony solely because objective medical

8  evidence does not fully substantiate it. *Robbins*, 466 F.3d at 883. Unless the ALJ finds that

9  affirmative evidence demonstrates that the claimant is a malingerer, he or she can only find the

10 claimant's testimony not credible by making specific findings of credibility and supporting each

11 such finding with clear and convincing evidence. *Id.*

12     In this case, the ALJ addressed Plaintiff's reports and testimony thoughtfully and in detail:

13 According to a Disability Report-Adult, the claimant's ability to work is limited by
   muscle and nerve damage in both feet and neuropathy (Exhibit 2E1). The claimant
14 believes his condition is worsening (Exhibit 9E2).

15 The claimant prepared a pain questionnaire on July 30, 2006 (Exhibit 3E). He
   reported that the pain began in 2003; that the pain is located in his feet and legs;
16 and that the pain is constant (Exhibit 3E1). During the day he watches television
   with his feet elevated (Exhibit 3E2).
17
   The claimant testified that during the day he watches television, eats, runs errands,
18 and rests.

19 The claimant's statements and those of third parties concerning the claimant's
   impairments and their impact on the claimant's ability to work are not credible in
20 light of the discrepancies between the claimant's assertions and information
   contained in the documentary reports and the reports of the treating and examining
21 practitioners. Although I do not find the claimant at all times symptom free, the
   evidence does not support the degree of limitation the claimant alleges.
22
   Although the claimant has described daily activities which are fairly limited, two
23 factors weigh against considering these allegations to be strong evidence in favor
   of finding the claimant disabled. First, allegedly limited daily activities cannot be
24 objectively verified with any reasonable degree of certainty. Secondly, even if the
   claimant's daily activities are truly as limited as alleged, it is difficult to attribute
25 that degree of limitation to the claimant's medical condition, as opposed to other
   reasons, in view of the relatively weak medical evidence and other factors
26 discussed in this decision.

27 The claimant has not generally received on-going and continuous medical
   treatment of the type one would expect for a totally disabled individual and the
28 claimant's alleged loss of function is not supported by objective medical findings.

I also not that some of the claimant's subjective symptoms are unsupported by objective medical tests.

Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance, presentation and demeanor while testifying at the hearing.  It is emphasized that this observation is only one being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity and not determinative.

AR 17-18.

The ALJ did not fail to properly evaluate Plaintiff's testimony.

**4.      Failure to Recontact the Consulting Examiner**

Plaintiff contends that pursuant to his duty to look fully into the issues as prescribed by 20 C.F.R. § 404.944, the ALJ was required to request supplementary information from the consulting examiner, setting forth statements regarding what Plaintiff is able to do despite his impairments. The agency responds that Plaintiff does not specify what information the ALJ was missing and speculates that Plaintiff thinks the ALJ should have requested that McIntire comment on O'Dell's opinion that Plaintiff needed to lie down or elevate his feet.  Plaintiff responds that because McIntire's opinion is now old and does not comment of Plaintiff's need to lie down, the ALJ was required either to accept O'Dell's opinion or to secure a supplementary report from McIntire.

No legal basis exists for Plaintiff's unusual proposition that the ALJ must require either the authors of contradictory opinions to debate or comment on each other's conclusions or accept the opinion favorable to the Plaintiff.  This Court declines Plaintiff's invitation to create one.

**III.    Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   __August 4, 2010__                    _____**/s/ Sandra M. Snyder**_____
                                                UNITED STATES MAGISTRATE JUDGE